IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 8, 2005

## STATE OF TENNESSEE v. BRIAN ERIC MCGOWEN, A.K.A. BRAD LEE O'RYAN

**Direct Appeal from the Criminal Court for Davidson County
No. 2002-A-506    J. Randall Wyatt, Jr., Judge**

---

**No. M2004-00109-CCA-R3-CD - Filed August 18, 2005**

---

The appellant, Brian Eric McGowen, a.k.a. Brad Lee O'Ryan, was convicted by a jury in the Davidson County Criminal Court of first degree felony murder, especially aggravated robbery, and attempted especially aggravated robbery. The trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction for his murder conviction, to forty years incarceration for his especially aggravated robbery conviction, and to twenty years incarceration for his attempted especially aggravated robbery conviction. On appeal, the appellant raises numerous issues for our review, including the sufficiency of the evidence supporting his convictions, evidentiary issues, jury instructions, and sentencing. Upon our review of the record, we merge the appellant's conviction for attempted especially aggravated robbery into his conviction for especially aggravated robbery. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and J.C. MCLIN, JJ., joined.

Jeffery Allen DeVasher (on appeal), Richard Tennent (at trial), and Sharon Ruiz (at trial), Nashville, Tennessee, for the appellant, Brian Eric McGowen, a.k.a. Brad Lee Ryan.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James Todd and Michael Rohling, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

The State's proof at trial revealed that at approximately noon on Friday, February 18, 2001,

the victims, Joseph and Patricia Barker, went into Seanachie's Restaurant, which was located near the intersection of Broadway and Fourth Avenue in downtown Nashville. The couple ate lunch and discussed plans for their upcoming vacation. Approximately one hour later, the couple left the restaurant and walked toward an alley beside the restaurant where their vehicle, a maroon Chevrolet Tahoe, was parked. Mr. Barker, who was planning to drive, walked toward the driver's door while Mrs. Barker walked toward the front passenger door. As Mr. Barker approached the door, he saw something out of the corner of his eye, to his right. He turned and saw a young man, later identified as Richard Wheeler, pull a toboggan cap over his face and point a pistol at him. At trial, Mr. Barker testified that he immediately realized what was taking place. Wheeler demanded money from Mr. Barker. Mr. Barker explained to Wheeler that he did not have any cash, but he offered Wheeler a beeper. Wheeler took the beeper.

Mrs. Barker, who was on the other side of the vehicle, asked, "[W]hat's going on?" Wheeler, hearing her voice, instructed Mr. Barker to "tell your old lady to come over here." Mr. Barker did not say anything to Mrs. Barker. However, through the car windows, he saw that she was moving. Mr. Barker testified that he did not want his wife involved. He grabbed Wheeler's arm and screamed at his wife to get away. Mr. Barker explained:

> A struggle ensued. And [Wheeler] broke away. . . . And as [Mrs. Barker] came around the back of the car, he shot her at least once and, maybe, twice. And I was able to get ahold of him, again. I don't know whether he shot her again, but we were in – struggling at that point.
>
> And I, finally, really, got a good hold of him. And he was able to – he had– his gun hand was free. And I was hitting him. And he was kind of – and I guess the term would be pistol whipping, or something. He was hitting me in the face. But the next instance I realized, and it's one of those – you don't realize it until you're in it, but the gun was pointed right at my chest. I had been – I had fallen down. I was on my knees. And the gun was pointed right at my chest.
>
> And with my left hand, not right my right hand, I knocked it up. And just the second that I knocked the gun up, it went off, because I remember to this day, and I've said this before that simultaneously with knocking the gun up, I – I heard the gunshot. And I smelled the – the explosive charge. And I felt, you know, huge intense pain as the bullet hit me. It hit me up in my left shoulder. But I don't know how these things happen, but the bullet ended up going down. And I guess that's why – I guess because I was down on my knees, and as I knocked it up, it still had [traveled] down into my body.

As the struggle continued, Mr. Barker managed to pull off Wheeler's jacket and toboggan. Additionally, Wheeler lost control of the pistol. Wheeler escaped from Mr. Barker's hold and ran from the scene. Mr. Barker crawled to where Mrs. Barker was lying on her back. She was briefly conscious before an ambulance arrived at the scene.

Within minutes, police and emergency medical services arrived at the scene. The Barkers were taken to the hospital. At the hospital, Mrs. Barker was rushed into surgery. However, her injuries were too severe, and she died during the procedure.

At trial, Mr. Barker testified that his injuries were extensive. The bullet traveled from his left shoulder down the left side of his body. The bullet fractured all of his ribs on the left side, grazed his heart, went through his spleen and lung, and lodged in his back. Mr. Barker's spleen was destroyed and had to be removed. Mr. Barker underwent several surgeries as a result of his injuries. However, doctors were unable to extract the bullet from Mr. Barker's body.

While the Barkers were being transported to the hospital, police began searching the area for the perpetrator or perpetrators. Police quickly apprehended Wheeler a short distance from the scene. Wheeler was taken into custody and transported to the Criminal Justice Center (CJC) for an interview. The interview began at 4:00 p.m. that day. During the interview, Wheeler told police of the appellant's involvement in the crime and that he could possibly be found at a house on Apex Street. At 5:30 p.m., police went to 876 Apex Street and arrested the appellant. At the residence, police discovered a black coat with a red and white "Fila" emblem.

A couple of days after the shooting, Charles Malone was interviewed by police. At trial, Malone testified that on the day of the shooting, he was walking to work at the Hermitage Hotel in downtown Nashville when he saw two "Mexicans," or men with dark complexions, who "looked kind of suspicious." He believed that the two men were panhandling. Malone watched as the men walked toward what Malone believed to be a Chevrolet Blazer, then the males separated. One of the men, whom Malone later identified as Wheeler, approached the Barkers, and the other male, whom Malone identified as the appellant, stood at the corner of the building. Malone then heard three gunshots and saw Mr. Barker and Wheeler struggling over a gun. Malone recalled that the appellant, who was wearing a black coat with a red and white "Fila" emblem, "took off running" when the struggle over the gun began.

Richard Wheeler testified at trial on behalf of the State. Wheeler stated that prior to trial, he pled guilty to felony murder and especially aggravated robbery due to his participation in the crimes against the Barkers. Wheeler testified that he was sixteen years old at the time of the offenses.

Wheeler stated that on Friday, February 16, 2001, he went to spend the weekend with his friend, Anthony James Zonneville at his home at 876 Apex Street in Nashville. Zonneville, the appellant's step-son, was fourteen years old. Floyd Gillihan, another juvenile friend of Wheeler and Zonneville, was also at the residence. The appellant arrived at the residence on February 16, and he was the only adult in the house.

At trial, Wheeler said that early in the day on February 16, before going to Apex Street, he had purchased a Pit .380 caliber semi-automatic pistol because he "was having problems" with his girlfriend's former boyfriend. The pistol was loaded with four or five bullets. The following day, February 17, 2001, Wheeler showed the pistol to Gillihan, Zonneville, and the appellant.

On the morning of Sunday, February 18, 2001, Gillihan and Zonneville left the house to visit friends. Wheeler and the appellant stayed at the house. The appellant told Wheeler that he was going downtown to "get him some money" and asked Wheeler if he wanted to go with him. Wheeler agreed to go with the appellant. As they were getting ready to leave, the appellant gave Wheeler a dark toboggan cap to put on, advising him that it was cold outside. Wheeler wore a gray jacket, and the appellant wore a black coat which had a red and white "Fila" emblem on the back.

After leaving the house, Wheeler and the appellant began the forty-five minute trek downtown, walking beside the railroad tracks. As they were walking, the appellant asked Wheeler if he still had the pistol. Wheeler pulled out the pistol and gave it to the appellant. The appellant "fooled around with it for a while" and then returned the pistol to Wheeler.

Eventually, the pair arrived downtown. At trial, Wheeler recalled that near Printer's Alley

> there was a guy with some gray hair talking on the cell phone in the
> trunk of his BMW. And [the appellant] just comes out and says, let's
> rob him. And so I was, like, no. At first, I was, like, no. And then
> he said, what, are you gonna be a bitch?

The appellant told Wheeler that Wheeler's toboggan cap had eye holes cut out of it. Wheeler again refused to rob the man, stating that he did not "feel like doing it." Additionally, Wheeler noticed that a man, Chester Malone, was standing nearby, watching them.

The appellant became angry with Wheeler and instructed Wheeler to follow him. Wheeler said that he followed the appellant because he "wanted to fit in with him." Wheeler and the appellant continued to walk until they reached the intersection of Fourth Avenue and Broadway. Across the street they saw the Barkers leaving Seanachie's Restaurant. The appellant pointed to Mr. Barker and said, "[W]e're fixing to rob him." Wheeler initially refused. The appellant said, "[W]hat, are you gonna bitch out on me again?" Wheeler then agreed to participate in the robbery. Wheeler and the appellant started crossing the street at the same time. Wheeler, believing the Barkers would get into their vehicle before he could reach them, increased his speed. En route, he pulled his toboggan cap over his face and pulled out his pistol. Wheeler stated that he did not pull the toboggan over his face until he was near Mr. Barker because he did not want to attract attention to himself.

Wheeler testified that he confronted Mr. Barker and demanded money. Mr. Barker told Wheeler that he had no money; however, he offered Wheeler his beeper. As Wheeler reached for the beeper, he heard Mrs. Barker's voice from behind. Wheeler turned to look toward the direction

-4-

of Mrs. Barker's voice, and Mr. Barker grabbed the pistol. The two men "started to rassling," and Wheeler heard a gunshot. The struggle over the pistol continued, until Mr. Barker struck Wheeler. Wheeler stated that the blow "brought me back to my senses." Mr. Barker had a grip on Wheeler's jacket. Wheeler wiggled out of his jacket and ran, leaving behind his pistol, his jacket, and his toboggan. As he ran from the scene, Wheeler saw Malone standing across the street.

Within a matter of minutes, police apprehended Wheeler. Wheeler identified the appellant as the person with him, and also advised police that the appellant could likely be found at the house on Apex Street. Wheeler testified that the appellant was wearing a hat and a "Fila" jacket at the time of the offenses. Wheeler further testified that he had never met the appellant prior to February 16, 2001.

Kenny Warren, a hospital facility director, testified that on Sunday, February 18, 2001, he and his wife drove to downtown Nashville after attending church. The couple drove south on Fourth Street. As they crossed Broadway, Warren noticed four people standing in a parking lot. Three of the individuals, the Barkers and an unidentified man, were standing fairly close together. Another man was standing approximately fifteen feet to the left of the others. Warren stated that he noticed the group because the man with the Barkers was wearing a gray jacket and had his toboggan cap pulled down in a mask over his face. Warren found that unusual because of the warm day. Warren stopped his car and saw that the man in the mask was holding a pistol, "kind of on the lady." Warren recalled:

> Mr. Barker grabbed for the gun. The gentleman had the gun on his wife. He went for the gun. And that's when one shot was fired. And they got into a struggle, which is more toward the sidewalk. That's when another two or three shots were fired. [Mrs.] Barker collapsed. And he crawled back to where his wife was. There was a gentleman, a black gentleman [Malone] behind me or right there at the left corner of our Explorer. He saw the whole thing.

Warren stated that Mr. Barker grabbed the shooter's coat during the struggle. The other man, who had been standing a short distance away, ran when shots began to be fired. Warren said that the man was wearing a dark jacket and that he saw "something red when he was running away on the back of his coat."

Dr. John E. Gerber testified that he performed the autopsy on Mrs. Barker. Dr. Gerber said that Mrs. Barker had been struck by three bullets. The first shot was fired from a distance greater than two feet and struck her abdomen. The bullet went through the liver, the inferior vena cava, the diaphragm, and the right lung, ultimately lodging in the skeletal muscle. Dr. Gerber stated that this wound was fatal and caused immediate incapacitation. The second gunshot wound entered the victim's left forearm and was fired from a distance greater than two feet. The third bullet entered the back of the victim's left thigh and was a contact wound. Dr. Gerber opined that the manner of death was homicide and the cause of death was multiple gunshot wounds to the torso and

extremities.

At trial, the appellant testified in his own behalf. The appellant stated that he arrived at 876 Apex late on the evening of Friday, February 16, 2001. During the weekend, he ingested cocaine, dilaudids, marijuana, and alcohol. On Saturday, the appellant became aware that Wheeler had a pistol at the house. The appellant asked Zonneville, his stepson, to tell Wheeler to get the pistol out of the house. The appellant explained that he thought Zonneville should order Wheeler to dispose of the weapon because Zonneville was "running things" at the house.

On Sunday, February 18, 2001, Zonneville and Gillihan left the appellant and Wheeler at the residence. The appellant planned to go downtown to get money for drugs. The appellant testified that he planned to obtain the money by stealing from cars or by going to The Jungle, a gay bar, to engage in male prostitution. Wheeler accompanied the appellant downtown. On direct examination, the appellant stated that Wheeler pulled the pistol out while they were on the railroad tracks but that the appellant never touched it. However, on cross-examination, the appellant averred that he did not see the pistol until after they arrived downtown.

After the pair reached downtown, they saw a man standing at the trunk of his BMW. The trunk contained a toolbox and a cordless drill. The man was talking on a cellular telephone. The appellant wanted to steal the toolbox and the drill, but the man would not step away from his vehicle. Wheeler talked about "smacking" the man in the head with the pistol. The appellant thought Wheeler was "crazy."

The pair proceeded to Fourth Avenue and Broadway where they saw the Barkers on the street. Wheeler told the appellant, "Watch this shit." Wheeler then rushed across the street. He pulled down his mask and pointed his pistol as he approached the Barkers' vehicle. Initially, the appellant testified that "when the gun come out, I left." However, he later stated that he left the area when the struggle for the pistol began.

After leaving downtown, the appellant returned to 876 Apex Street. The appellant had stolen checks out of a car the previous evening, and he used the checks to obtain money for drugs. The appellant stated that he was "high" when the police arrived to arrest him. The appellant admitted that he was wearing a black coat with a red and white "Fila" emblem on the day of the shooting.

Based upon the foregoing, the jury convicted the appellant of first degree felony murder, especially aggravated robbery, and attempted especially aggravated robbery. The appellant received a total effective sentence of life imprisonment plus sixty years. On appeal, the appellant raises the following issues:

> [(1)] Did the trial court err in denying the [appellant's] motion to suppress his statement to police?
>
> [(2)] Did the trial court err in admitting the tape-recorded preliminary

hearing testimony of a prosecution witness where the State made insufficient efforts to establish that the witness was unavailable and the witness was not subjected to cross-examination at the preliminary hearing?

[(3)] Is the evidence contained in the record sufficient to support a finding by a rational trier of fact that the [appellant] is guilty beyond a reasonable doubt of felony murder, especially aggravated robbery, and attempted especially aggravated robbery?

[(4)] Did the trial court err in reversing its pretrial ruling that the [appellant's] prior conviction for aggravated robbery was inadmissible for impeachment purposes, and in allowing said conviction into evidence on the basis that defense counsel had "opened the door" to its admission?

[(5)] Did the trial court err in granting the State's special jury instruction request when said instruction allowed the jury to disregard the "natural and probable consequences" rule?

[(6)] Did the trial court err in imposing the maximum sentences on the [appellant's] convictions for especially aggravated robbery, and attempted especially aggravated robbery, and did the court further err in imposing consecutive sentences on all counts?

## II.  Analysis

### A.  Motion to Suppress

First, the appellant argues that the trial court erred in failing to suppress his statement to police.  In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  Id.  Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo.  See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).  Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Odom, 928 S.W.2d at 23.  Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial."  State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Generally, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id.; see also Miranda v. Arizona, 384 U.S. 436, 444-45, 478-79, 86 S. Ct. 1602, 1612, 1630 (1966). Additionally, the trial judge's findings of fact at the motion to suppress hearing are accorded the weight of a jury verdict. See State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court unless the evidence preponderates otherwise. Odom, 928 S.W.2d at 22-23.

Prior to trial, the appellant filed a motion to suppress his statement to police, arguing that at the time the statement was made he "was not of right mind . . . [and] he did not, and could not, comprehend his right to remain silent, and thus he did not knowingly and voluntarily waive such right." At the suppression hearing, the appellant argued that he was under the influence of drugs and alcohol at the time he made his statement.

At the suppression hearing, Detective Mike Chastain with the Metropolitan Nashville Police Department (Metro) Armed Robbery Unit testified that the appellant was arrested at the residence at 876 Apex Street just hours after the offenses. When police entered the residence, the appellant "appeared to be in fine condition." The appellant was standing near the kitchen and

> appeared to be manipulating something around his arm area. As soon
> as he saw [the police] entering the house, he made a dash for the sink,
> but, after further investigation, there was a syringe and needle in the
> drain of the sink.

Detective Chastain testified that the appellant had blood on his arms, indicating that he had been "shooting something up," or had been preparing to do so. The needle was not recovered or tested for drugs. Detective Chastain recalled seeing beer containers at the residence, but he did not recall if the containers were full or empty. Additionally, he believed that there might have been some marijuana "residue" in the house.

Detective Chastain acknowledged that he did not ask the appellant if he had been drinking or using drugs prior to his statement. However, Detective Chastain noted that during the course of the ninety-minute interview, the appellant did not appear to be under the influence of an intoxicant. Detective Chastain stated that the appellant was not unsteady on his feet, his speech was not slurred, he did not "reek" of any intoxicating substance, and he was able to engage in conversation. Prior to the interview, Detective Chastain read the appellant his Miranda rights, and the appellant signed a waiver of those rights.

During the interview, the appellant admitted that he went downtown with Wheeler. He also acknowledged walking halfway across the street toward the Barkers at the beginning of the robbery.

However, the appellant denied that he intended to rob the Barkers.

At the suppression hearing, the appellant testified that shortly before he was arrested he "drank several forty-ounce beers . . . smoked a couple of dime bags of weed . . . [a]nd shot some cocaine and dilaudids." The appellant said that when he was arrested, "I was high. . . . I thought I was on a bad trip. . . . A very, very weird dream." He also claimed that he could recall only "bits and pieces" of the interview with Detective Chastain. The appellant alleged that at the time of the interview, "I was paranoid. I was still geeked on the cocaine. One minute I was – I was crashing. I was in and out."

The appellant acknowledged that he remembered being read his Miranda rights, but he said that he did not remember what those rights were. He contended that he did not understand what was going on and did not realize that he did not have to answer questions. The appellant admitted that he had previously been arrested for other offenses and on those occasions he had been read his rights. However, he maintained that he did not understand the waiver of rights.

In the order denying the motion to suppress, the trial court stated:

> After reviewing the video tape of the interview, the Court does not find that the [appellant] showed any obvious signs of being under the influence of drugs or alcohol. The [appellant] was able to communicate clearly with the detectives and was responsive to questioning. The [appellant] was also steady during the course of the interview and appeared to have no difficulty controlling his movements. Therefore, based upon the testimony of Detective Chastain and the video of the interview, the Court does not accept the [appellant's] contention that drug and alcohol use affected his ability to understand his rights at the time of the interview.
>
> . . . . The Court also finds that the [appellant] checked off and signed the written waiver of rights form given to him by the detectives, which clearly shows that the [appellant] consented to answer questions.
>
> Under all of the facts and circumstances, the Court is of the opinion that the [appellant] consented to speak with the detectives knowingly and voluntarily. The Court finds no evidence that the [appellant] was threatened or coerced into waiving his rights. The Court also finds no evidence that the [appellant] was unable to understand or comprehend his rights, when read by the detectives and given to him in written form.

Our review of the record reveals that the trial court's ruling is supported by the record. Detective Chastain testified that the appellant might have been preparing to "shoot[] up" drugs at

the time of his arrest, but he was unsure if the appellant had already done so. Further, Detective Chastain stated that the appellant did not appear to be under the influence of any intoxicating substance. The appellant was apprised of his rights, and he signed a written waiver of those rights. The trial court implicitly accredited Detective Chastain's testimony and discredited the appellant's testimony. The record does not preponderate against this ruling. Accordingly, we conclude that the trial court did not err in finding that the appellant's statement was admissible at trial.

## B. Unavailable Witness

The appellant's second issue concerns the trial court's ruling that the preliminary hearing testimony of the appellant's stepson, Anthony James Zonneville, could be introduced at trial. The substance of Zonneville's preliminary hearing testimony was that he was present when the appellant returned to the 876 Apex Street address following the crime. Zonneville stated that the appellant was nervous and said that he and Wheeler had "walked up on" a couple. Zonneville testified that the appellant said that he left when Wheeler began shooting.

Prior to trial, the State filed a motion asking the trial court to find that Zonneville was unavailable so that his preliminary hearing testimony could be introduced at trial. The appellant objected, arguing that Zonneville was not unavailable and that the defense did not cross-examine Zonneville at the preliminary hearing. The trial court held two evidentiary hearings to determine Zonneville's unavailability. The first evidentiary hearing was held on May 16, 2003, and was continued to allow for additional efforts to locate Zonneville. The second hearing was held on May 27, 2003, after additional attempts to locate Zonneville were unsuccessful.

Joe Wilkins, a case manager with the Department of Children's Services (DCS), testified that at the time of the hearing, the Department of Children's Services had legal custody of Zonneville. However, his whereabouts were unknown. According to Wilkins, Zonneville had been placed at the Wilson County Youth Ranch on April 21, 2003, and he had absconded from the ranch four days later. Thereafter, a juvenile court arrest order was issued for Zonneville because of his escape. Wilkins stated that locating Zonneville's last residence was "somewhat complicated, because of the itinerant nature of his family."

Detective Mike Chastain testified that approximately ten days prior to the May 16, 2003, hearing,

> I put out a bolo [be on the lookout] on the police shared computer, which is sent to all stations, patrol stations, any police personnel that gets police share, stating that we were looking for him as witness in this case. And I gave two locations, previous addresses that he's used in the past and sent that out.

The previous addresses were the 876 Apex Street address and two locations on Carter Street. Additionally, Detective Chastain spoke with officers who knew Zonneville, and he was advised that Zonneville had last been seen in the area of Apex Street or Carter Street three months prior to the

hearing. Detective Chastain also spoke with residents of Carter Street, and they maintained that Zonneville had not lived in the area for several months. However, Zonneville had been "spotted on occasion cruising through the area." Detective Chastain learned that Zonneville had altered his appearance by cutting his hair.

Eddie Simmons, an investigator with the District Attorney General's office, testified that he had attempted to locate Zonneville. However, he explained that his resources for finding a juvenile were "very limited." Simmons checked several addresses without success. Further, Simmons attempted to find Zonneville's friend, Floyd Gillihan, but Simmons was unable to locate him.

In an effort to locate Mary Ann Malone, Zonneville's mother, Simmons went to a shelter where she had stayed and to an address she had listed as her residence on some traffic tickets. However, he was unable to locate her. Simmons also went to the home of Zonneville's girlfriend, and, although the residence appeared to be inhabited, no one answered the door.

At the conclusion of the hearing, the trial court found that the State had made an "honest, good-faith effort" to locate Zonneville. Therefore, the trial court found that Zonneville was unavailable. The trial court further found that although the appellant failed to cross-examine Zonneville at the preliminary hearing, the appellant had the opportunity to do so. The court stated, "I think the motive – the case is the same. The defendant is the same. The issues are the same." Accordingly, the trial court determined that Zonneville's preliminary hearing testimony could be introduced at trial.

On appeal, the appellant claims that "the State did not sufficiently establish Zonneville's unavailability," and "the State did not establish that the motive not to cross-examine Zonneville at the preliminary hearing was similar to the motive to cross-examine him at trial." The appellant also claims that the admission of Zonneville's preliminary hearing testimony violated his right to confrontation.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Clearly, Zonneville's preliminary hearing testimony was hearsay. See Tenn. R. Evid. 801(c). However, in limited circumstances, prior testimony may be admissible at trial via a hearsay exception if the declarant is unavailable and if the party against whom the testimony is offered had an opportunity and a similar motive to develop the testimony through methods such as cross-examination. See Tenn. R. Evid. 804(b)(1). One method for demonstrating unavailability is if the witness "[i]s absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). Moreover, this court has concluded that when the State seeks to introduce former testimony of an unavailable witness, the State must

> establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the state must show that

the declarant is truly unavailable after good faith efforts to obtain his presence, and second, that the evidence carries its own indicia of reliability.

State v. Summers, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004).

As we noted earlier, the trial court concluded that the State "made an honest, good-faith effort," to find Zonneville. We agree with the trial court. The State presented ample testimony of repeated, thwarted attempts to secure Zonneville's attendance at trial. We conclude that the evidence supports the trial court's finding that Zonneville was unavailable for trial. Additionally, we note that our supreme court has determined that the former testimony exception to the hearsay rule is based upon such a solid foundation that it meets the indicia of reliability requirement. See State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986). In other words, "by definition the former testimony was given under oath, traditionally a strong indicia of truthfulness." Neil P. Cohen et al., Tennessee Law of Evidence, § 8.34[2][a] (LEXIS publishing, 4th ed. 2000).

The appellant also challenges the trial court's finding that he had a similar motive to cross-examine Zonneville at the preliminary hearing and at trial. The appellant concedes that he did not cross-examine Zonneville at the preliminary hearing. Rule 804(b)(1) provides that the former testimony of an unavailable witness is admissible if the party against whom the testimony is being offered had both "an opportunity and a similar motive to develop the testimony." Tenn. R. Evid. 804(b)(1). Notably, a leading treatise has explained that "the witness need not have actually been examined by the party against whom it is being used in order for the rule to be satisfied. . . . Counsel who forgoes extensive . . . cross-examination takes a risk that the witness's testimony may be later used if the witness becomes unavailable." Cohen, supra, § 8.34[5]. In the instant case, the appellant had the *opportunity* to cross-examine Zonneville at the preliminary hearing; however, he chose not to exercise this opportunity.

The trial court further found that the motive to cross-examine Zonneville was the same because the issues and the parties were consistent at the preliminary hearing and at the trial. We note that "the purpose of a preliminary hearing is . . . to determine whether there exists probable cause to believe that a crime has been committed and that the accused committed the crime." State v. Lee, 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985). Additionally, in State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993), our supreme court concluded that the preliminary hearing testimony of a co-defendant could be introduced at trial under the former testimony exception. The court noted that the defendant had a "full opportunity and similar motive to develop the prior testimony." Id. The court stated that in reaching its decision, it considered several factors. Id. However, "the most emphasis was placed on the fact that at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[] had committed the offense' charged." Id.; see also Causby, 706 S.W.2d 631-32.

In the instant case, the purpose of Zonneville's testimony at the preliminary hearing and at trial was to demonstrate the appellant's involvement in the robbery and murder. See Howell, 868 S.W.2d at 251; State v. Robert Anthony Devito, No. 01C01-9509-CC-00285, 1996 WL 682148, at

-12-

*5 (Tenn. Crim. App. at Nashville, Nov. 27, 1996). Accordingly, the trial court did not err in finding that the motives were similar at both proceedings.

Finally, the appellant argues that admitting Zonneville's preliminary hearing testimony "violated his constitutional right to confront and cross-examine witnesses under the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Tennessee Constitution, and the United States Supreme Court's decision in Crawford v. Washington, [541 U.S. 36, 124 S. Ct. 1354 (2004)]." The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Likewise, Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face."

In Crawford, the Supreme Court examined the right to confrontation. The court summarized the factual basis of the case by saying, "Petitioner . . . stabbed a man who allegedly tried to rape his wife, Sylvia. At his trial, the State played for the jury Sylvia's tape-recorded statement to the police describing the stabbing, even though he had no opportunity for cross examination." 541 U.S. at 38, 124 S. Ct. at 1356-57. The court noted, "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 127 S. Ct. 1374. Clearly, preliminary hearing testimony meets the definition of "testimonial evidence." Id. Thus, to satisfy constitutional concerns and the dictates of Crawford, the testimonial evidence must have been offered by an unavailable witness and the party against whom the evidence is offered must have had a prior opportunity for cross-examination. See State v. Gomez, 163 S.W.3d 632, 642 (Tenn. 2005). We have already concluded that Zonneville was unavailable and that the appellant had the opportunity to cross-examine Zonneville at the preliminary hearing. Therefore, the appellant's right to confrontation was not violated by the admission at trial of Zonneville's preliminary hearing testimony.

## C. Sufficiency of the Evidence

The appellant next challenges the sufficiency of the evidence supporting his convictions. Specifically, the appellant asserts:

> (1) "The [appellant's] convictions are based upon circumstantial evidence that does not exclude every reasonable hypothesis except that of his guilt";
>
> (2) "The [appellant's] convictions cannot stand because they were based upon the uncorroborated testimony of his alleged accomplice, Richard Wheeler";
>
> (3) "The evidence is insufficient to convict the [appellant] of felony murder because the murder of Patricia Barker was not the natural and probable consequence of Wheeler's robbery and/or attempted robbery";

-13-

(4) "The evidence is insufficient to support the [appellant's] conviction for especially aggravated robbery because Wheeler was unsuccessful in taking property from Joseph Barker"; and

(5) "The [appellant's] convictions for both especially aggravated robbery and attempted especially aggravated robbery of Joseph Barker violate double jeopardy."

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In the light most favorable to the State, the proof adduced at trial revealed that the appellant and Wheeler left a residence in east Nashville and walked to downtown Nashville in order to obtain money. The appellant gave Wheeler a toboggan cap before they left the residence. While walking near the railroad tracks, the appellant became aware that Wheeler possessed a pistol he had shown the appellant earlier in the weekend. The appellant asked to see the pistol, examined it, and gave it back to Wheeler. Upon their arrival in the downtown area, they saw a man standing at the trunk of his BMW automobile. The appellant suggested that he and Wheeler rob the man and informed Wheeler that the toboggan cap had eye holes cut out of it. Wheeler refused to rob the man, and the appellant called him a "bitch."

The two men continued walking until they reached Fourth Avenue and Broadway where they saw the Barkers. The appellant pointed to Joseph Barker and said, "[W]e're fixing to rob him." Wheeler again refused to participate in the crime until the appellant taunted, "[W]hat, are you gonna bitch out on me again?" The appellant and Wheeler then proceeded across the street toward the Barkers. Wheeler, fearing the Barkers would get into their vehicle before he reached them, increased his pace. As he approached Mr. Barker, Wheeler pulled down his toboggan, pointed his gun at Mr. Barker, and demanded money. Mr. Barker responded that he had no money but offered a beeper instead. Mr. Barker testified that Wheeler took the beeper. Mrs. Barker came around the back of the vehicle, and, during a struggle with Mr. Barker over the gun, Wheeler shot her. She died as a result of her gunshot wounds. Also during the struggle, Mr. Barker was beaten and shot. He was severely injured and had to undergo three surgeries. A bullet, lodged in his back, could not be removed.

Based upon the foregoing, the appellant was convicted of the first degree murder of Patricia Barker committed during the perpetration of or attempt to perpetrate a robbery, which offense is otherwise known as felony murder. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (1997).

The appellant was also convicted of the especially aggravated robbery of Joseph Barker by taking his beeper and the attempted especially aggravated robbery of Joseph Barker by attempting to take United States currency. Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2) (1997). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997).

In its jury charge, the trial court also instructed the jury on the theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (1997). Tennessee Code Annotated section 39-11-402(2) (1997) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when an appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. See State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997). Specifically, the natural and probable consequences rule

> extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime.

State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000).

First, we will address the appellant's concern that his convictions were based solely upon circumstantial evidence. It is well-established that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Moreover, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

Black's Law Dictionary 577 (7th ed. 1999) defines direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or

presumption." Direct evidence is also considered to be "[a] witness's statement that he or she perceived a fact in issue by one of the five senses, or that the witness was in a particular physical or mental state." Id. at 579. In the instant case, Wheeler testified to the appellant's presence at the scene and his intent to rob the victims. Additionally, Malone testified that the appellant was with Wheeler immediately prior to and during the shooting. Further, the appellant himself testified that he was with Wheeler when the robbery and shooting began to take place. Accordingly, at least a portion of the proof against the appellant derived from direct evidence. Therefore, the case against the appellant was not purely circumstantial.

Next, we turn to whether Wheeler's testimony was corroborated by other proof. Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). "An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime." Id. Because Wheeler was arrested and indicted for the same offenses as the appellant, we conclude that he was an accomplice as a matter of law. See State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001).

In order for Wheeler's testimony to be corroborated,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

Henley v. State, 489 S.W.2d 53, 56 (Tenn. Crim. App. 1972). "The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration." State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Additionally, such corroborative evidence may be direct or circumstantial. See State v. Spadafina, 952 S.W.2d 444, 450 (Tenn. Crim. App. 1996). "[T]he question of corroboration of an accomplice's testimony is for the jury to determine." State v. Robert Allen Garner, No. 03C01-9205-CR-00178, 1993 WL 3474, at *4 (Tenn. Crim. App. at Knoxville, Jan. 11, 1993).

Our review of the record reveals that the appellant corroborated most of Wheeler's testimony. The appellant's version of events closely resembled Wheeler's account, with the exception of who initiated the discussion regarding the robbery of the man standing near the BMW and the robbery of the Barkers. Moreover, Malone testified that he had seen the appellant and Wheeler walking around downtown earlier in the day and that the appellant and Wheeler walked together toward the Barkers at the beginning of the robbery. Another witness, Kenny Warren, saw a man standing ten to fifteen feet away from Wheeler and Mr. Barker as they were fighting over the gun. The man was wearing a dark coat with "something red on the back." Zonneville's testimony reveals that the appellant told him that he and Wheeler "walked up on a couple and [Wheeler] had the gun. And then [the appellant] said that he's – when – he heard three shots, and he was gone." Based upon this

-16-

proof, we conclude that Wheeler's testimony was more than adequately corroborated.

Now, we will address the issues raised by the appellant regarding his robbery convictions. The appellant contends that the proof did not show that Wheeler took a beeper from Mr. Barker. However, Mr. Barker testified that because he had no cash he offered Wheeler a beeper and that Wheeler took the beeper. Accordingly, there was proof in the record that Wheeler exercised control over the beeper. Mr. Barker testified that he was "scared to death." Moreover, during the course of the robbery, Wheeler shot Mr. Barker, resulting in severe injuries that required three surgeries and left a bullet lodged in his back. Thus, Mr. Barker suffered serious bodily injury. See Tenn. Code Ann. § 39-11-106(a)(34) (2003); State v. Oneal Sanford, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, at *3 (Tenn. Crim. App. at Knoxville, June 18, 2001). Further, both the appellant and Wheeler asserted that the appellant wanted to go downtown to get money. Wheeler testified that he pursued the robbery of the Barkers at the appellant's instruction. Thus, the appellant was "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [when he ] . . . direct[ed] . . . [Wheeler] to commit the offense," rendering him criminally responsible for Wheeler's actions. Tenn. Code Ann. § 39-11-402(2). Accordingly, we conclude that the proof at trial overwhelmingly established that the appellant was guilty of the especially aggravated robbery of Mr. Barker. Likewise, the proof was sufficient for a jury to find the appellant criminally responsible for the attempted especially aggravated robbery of Mr. Barker by the unsuccessful attempt to take his cash.

The appellant also argues that "the murder of Mrs. Barker was not the natural and probable consequence of Wheeler's robbery and/or attempted robbery" of Mr. Barker. Our supreme court has explained:

> "The [natural and probable consequences] rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." In contrast, the felony murder statute . . . does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable. "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other."

State v. Winters, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003) (citations omitted). In other words, the appellant was responsible for the murder of Mrs. Barker which was committed during the course of the robbery, whether or not the murder was foreseeable. Id. Mrs. Barker died as a result of the gunshot wounds she sustained during the course of the especially aggravated robbery of Mr. Barker, rendering the homicide felony murder.

Finally, the appellant claims that his conviction for the especially aggravated robbery of Mr.

-17-

Barker by taking a beeper and his conviction for the attempted especially aggravated robbery of Mr. Barker by the attempt to take cash violate double jeopardy. The double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). The present case involves the third category. In Tennessee, whether two offenses are the 'same' for double jeopardy purposes depends upon a close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances. See State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). This analysis is guided in part by the application of the test announced in Blockburger v. United States:

> Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

Black, 524 S.W.2d at 919 (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)). In order to determine if double jeopardy attaches, our supreme court devised a four-part test:

> (1) a Blockburger analysis of the statutory offenses;
>
> (2) an analysis, guided by the principles of [Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973)], of the evidence used to prove the offenses;
>
> (3) a consideration of whether there were multiple victims or discrete acts; and
>
> (4) a comparison of the purposes of the respective statutes.

Denton, 938 S.W.2d at 381. However, "if the offenses are the 'same' under Blockburger, the federal constitutional double jeopardy protections have been violated and the inquiry may end." State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999).

The State contends that the attempted taking of the money and the completed taking of the beeper were "two separate acts of robbery." We disagree. The proof at trial reveals that Wheeler demanded money, but Mr. Barker had none. As an alternative, he offered Wheeler a beeper, which Wheeler took. We conclude that the acts "were accomplished at the same time and are but parts of a single continuing criminal act, inspired by the same criminal intent which is essential to each offense." State v. Warren, 750 S.W.2d 751, 754 (Tenn. Crim. App. 1988); see also State v. Henderson, 620 S.W.2d 484, 486 (Tenn. 1981). Therefore, we conclude that the appellant's conviction of attempted especially aggravated robbery should be merged into the appellant's conviction of especially aggravated robbery.

## D. Impeachment

The appellant asserts that the trial court erred in its rulings regarding the admission of the appellant's prior conviction for aggravated robbery for impeachment purposes. Prior to trial, the State filed a notice of its intent to use several of the appellant's previous convictions for impeachment purposes should the appellant choose to testify. Among the listed convictions were several convictions for theft and a conviction for aggravated robbery. The appellant challenged the State's ability to use the prior aggravated robbery conviction, arguing that the aggravated robbery conviction was similar to the instant charges. The appellant argued that the evidence of the previous robbery conviction would be unduly prejudicial, serving as propensity evidence. The trial court initially ruled that "out of an abundance of caution, . . . that conviction with that other robbery should not be considered if this man testifies. . . . I don't believe that they would do anything but go to propensity and would cause the Jury to – to look at from the standpoint this is a robbery, that was a robbery, and so forth."

At trial, during direct examination, the following colloquy occurred:

> Defense counsel: Okay. Now I want to ask you the big question. Why did you come to downtown Nashville on February 18th of 2001?
>
> The appellant: To get some quick easy money for some drugs.
>
> . . . .
>
> Defense counsel: Was robbery one of the methods you considered for making money that day?
>
> The appellant: Never.
>
> . . . .
>
> The appellant: The truth is I went downtown to make some money at the Jungle or steal something. I wasn't looking for no violent crimes. I'm just trying to get high. That's all I'm doing. I do it everyday. Everyday I go down there. Quick, easy money is what I was after.

After the conclusion of the appellant's direct examination, the State again moved to be allowed to question the appellant regarding the prior convictions, arguing that the appellant opened the door to the admission of the prior aggravated robbery conviction by stating that he never considered robbery as a way to make money that day. The trial court observed that the appellant denied considering robbery "[i]n a very emphatic way. [Defense counsel] asked the question, was robbery one of your considerations to make money that day? And he very firmly and emphatically

-19-

said, never. . . . I noticed . . . and made a note of it, as a matter of fact." The court stated that "it was a clear emphatic never, ever type of answer. And I think that's clearly implied that he would never resort to anything like that."

After considering the implications of allowing the prior robbery conviction to be admissible, the trial court made the following ruling:

> I've thought about this, you know, very carefully and as fairly as I can. And the issue is whether or not when this [appellant] gets on the stand . . . and when asked was robbery one of your considerations to make money that day, and he answered that question in a way that is, obviously, more than just that day, which is what [counsel], I think, meant to be only asking, by saying, never, in a very emphatic way that he said it, that I was sitting here looking at him when he said it, and as was the Jury. And when, later on, he talks about he's not looking for any kind of violent crimes at all, he's just looking to make some quick money, the implication being he's hustling gays at the Jungle, or whatever, or stealing some car, that he would never involve himself in that type of an offense of violence, that that is misleading to the Jury. It, clearly, indicates by strong implication that he would never, has never involved himself in things such as what we're here about, which is a robbery.
>
> In trying to consider it all, and trying to be as balanced as I can be about it, and recognizing that there's some prejudice on any of these convictions, but particularly, this one, I would say that I think the right way to do this is coming from the fact that I think he opened the door.

The trial court further instructed the State to simply ask the appellant if he had ever been convicted of a robbery, ordering the State to not delve into the number of previous robbery convictions or their designation as aggravated robberies. The State complied with the court's order, asking "And you had . . . a prior conviction for robbery, correct?" The appellant replied in the affirmative. On appeal, the appellant argues that the trial court erred by allowing the State to question the appellant regarding his prior conviction for robbery.

The admissibility of prior convictions for impeachment purposes is governed by Rule 609(a) of the Tennessee Rules of Evidence. Rule 609 provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> (1) The witness must be asked about the conviction on

cross-examination . . . .

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its prejudicial effect on the substantive issues, "a trial court should (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9, at 288 (2d ed. 1990)). A trial court's ruling under Rule 609 will not be reversed on appeal absent an abuse of discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Our supreme court has stated, "Robbery is a crime involving dishonesty and may be used for impeachment purposes." State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999). Therefore, the appellant's prior conviction of aggravated robbery is probative of his credibility. However, the conviction is substantially similar to the offense of especially aggravated robbery for which the appellant was on trial and which was the offense underlying the felony murder charge. When an impeaching conviction is substantially similar to the charged offense, a danger exists that a jury could be improperly influenced by such evidence. State v. Waller, 118 S.W.3d 368, 373 (Tenn. 2003) (citing State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999)). "However, evidence of a prior conviction that is substantially similar to the charged offense is not per se inadmissible for impeachment purposes. Under these circumstances, a trial court should carefully balance the impeaching conviction's relevance with regard to credibility against its unfair prejudicial effect on substantive issues." Id. (citations omitted).

The trial court initially ruled that the appellant's prior conviction for aggravated robbery was inadmissible for impeachment purposes. However, after the appellant's direct testimony, the trial court found that the appellant's emphatic assertion that he never considered robbery as a method for making money on the day of the shooting was misleading to the jury and implied that the appellant had never and would never consider participating in a robbery. We conclude that the trial court, who was in a position to see the appellant as he testified and to hear the inflection in his voice during the testimony, was in the best position to determine whether the appellant's testimony opened the door to the admission of his prior robbery conviction. See Childs v. State, 584 S.W.2d 783, 788 (Tenn. 1979); State v. Dankworth, 919 S.W.2d 52, 55 (Tenn. Crim. App. 1995). The appellant is not entitled to relief on this issue.

### E.  Jury Instructions

As his next issue, the appellant challenges the jury instructions given by the trial court. The appellant complains that the trial court instructed the jury on the natural and probable consequences rule, then, at the State's request, gave the following special instruction:

> When one enters a scheme with another to commit a robbery and a killing ensues, all defendants may be held responsible for the death, regardless of who actually committed the murder and whether the killing was specifically contemplated by the other. As long as the defendant intended to commit the robbery and a killing resulted during the robbery or attempt to perpetrate the robbery, each defendant is criminally responsible for the murder, regardless of whether he intended for the victim to die or participated in the act of murder.

The appellant argues that the "trial court erred in instructing the jury pursuant to the State's special request, because said instruction effectively invited the jury to disregard the 'natural and probable consequences rule.'"

"'The general principle in criminal cases is that there is a duty upon the trial judge to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge.'" State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn.1975)). In relation to the specific issue raised by the appellant, we note that this court has explained that "the natural and probable consequences rule instruction is required only for incidental crimes and not for the target crime." State v. Winters, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003). In the instant case, the appellant was not entitled to a natural and probable consequences instruction on especially aggravated robbery because that offense was the target crime. Id.

Additionally, this court has explained:

> "The [natural and probable consequences] rule underlies the doctrine
> of criminal responsibility and is based on the recognition that aiders
> and abettors should be responsible for the criminal harms they have
> naturally, probably and foreseeably put into motion."  In contrast, the
> felony murder statute, both as it existed at the time of the crime and
> today, does not require that a homicide committed during the course
> of one of the enumerated felonies be foreseeable.

Id. (quoting State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000)).  In other words, "'[w]hen one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other.'"  Id. (quoting State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000)).  Moreover, we note that this court has previously expressly approved of an instruction nearly identical to the instruction given in the instant case.  See State v. Joe A. Gallaher, No. E2001-01876-CCA-R3-CD, 2003 WL 21463017, at *6 (Tenn. Crim. App. at Knoxville, June 25, 2003).  Thus, the jury instruction given by the trial court was a fair and accurate explanation of the law.  This issue is without merit.

## F.  Sentencing

In his final issues, the appellant challenges the length of his sentences for especially aggravated robbery and attempted especially aggravated robbery and the imposition of consecutive sentences.[1]  Appellate review of the length, range or manner of service of a sentence is de novo.  See Tenn. Code Ann. § 40-35-401(d) (2003).  In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is on the appellant to demonstrate the impropriety of his sentences.  See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.  Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness.  Id. at (d); Ashby, 823 S.W.2d at 169.  In the instant case, the trial court misapplied certain enhancement factors; therefore, we will review the appellant's sentence purely de novo.

### 1.  Length of Sentences

First, we will address the appellant's complaint regarding the length of the sentence for his

---

[1] The appellant received an automatic life sentence for his felony murder conviction and does not challenge this sentence on appeal.  See Tenn. Code Ann. § 39-13-208(c) (2003).

especially aggravated robbery conviction.[2]  To begin a sentencing determination, a court should begin at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e).[3]  Especially aggravated robbery is a Class A felony.  Tenn. Code Ann. § 39-13-403(b) (1997).  The presumptive sentence for a Class A felony is the midpoint sentence within the appropriate range.  Tenn. Code Ann. § 40-35-210(c).  The appellant was sentenced as a Range II multiple offender, and on appeal, does not challenge this designation.  See Tenn. Code Ann. § 40-35-106(a)(1) (2003).  Accordingly, the presumptive sentence for the appellant's Class A felony conviction was thirty-two and one-half years.  See Tenn. Code Ann. § 40-35-112(b)(1) (2003).

The trial court found the existence of the following enhancement factors:

> (2) The [appellant] has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (3) The [appellant] was a leader in the commission of an offense involving two (2) or more criminal actors;
>
> (9) The [appellant] has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; and
>
> (11) The [appellant] had no hesitation about committing a crime when the risk to human life was high.

Tenn. Code Ann. § 40-35-114(2), (3), (9), and (11).  In applying these enhancement factors, the trial court imposed the maximum possible sentence of forty years.  See Tenn. Code Ann. § 40-35-112(b)(1).

Initially, we note that the appellant complains that the trial court erred in applying certain enhancement factors in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). At the time the appellant filed his brief, this court had maintained that Blakely "calls into question the continuing validity of our current sentencing scheme."  State v. Julius E. Smith, No. E2003-

---

[2]  Because we have concluded that the appellant's conviction for attempted especially aggravated robbery should be merged into his conviction for especially aggravated robbery, we will not address the propriety of his sentence for attempted especially aggravated robbery.

[3]  Beginning on June 7, 2005, Tennessee Code Annotated sections 40-35-114 (2003) and 40-35-210 (2003) were deleted in their entirety.  See S. Bill 2249, 104th Gen. Assembly, 1st Reg. Sess. (Tenn. 2005).  These sections were replaced with language rendering the enhancement factors advisory only.  See Tenn. Code Ann. § 40-35-114 (2005). Additionally, Tennessee Code Annotated section 40-35-210 (2005) abandoned a statutory minimum sentence.

01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004). However, recently in State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005), a majority of our supreme court found that, unlike the sentencing scheme discussed in Blakely, "Tennessee's sentencing structure does not violate the Sixth Amendment." As such, in the instant case, we must conclude that the trial court did not err in failing to submit the enhancement factors to the jury for their determination.

The appellant does not challenge the trial court's finding that he "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(2). The appellant's presentence report reflects that the appellant has two convictions for robbery, multiple convictions for theft and assault, and a conviction for criminal impersonation. Moreover, the appellant testified to his extensive drug use and that he committed thefts to support his addiction. Therefore, we conclude that the record amply supports the application of this enhancement factor.

The appellant contests the trial court's finding that he was a leader in the commission of the offense. Id. at (3). "Our cases have established that enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The trial court found that "clearly [the appellant's] involvement and his influence and his participation with the person nineteen years younger than him clearly causes this Court to believe between the two of them he would be the leader." This conclusion is supported by Wheeler's testimony at trial that the robbery was prompted by the appellant. Accordingly, we conclude that the trial court did not err in finding the appellant to be a leader in the commission of the offense.

The trial court also found that "[t]he [appellant] has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(9). The trial court explained, "He's, I believe, had a previous history of unwillingness to comply with the conditions of a sentence, obviously. He was on parole [when he committed the instant offenses]." "We note that this court has previously indicated that the commission of the offense for which a defendant is being sentenced should not make factor [(9)] applicable, emphasizing that there must be a *previous* history of unwillingness." State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995). Accordingly, the trial court erred in applying this enhancement factor. However, because the record reflects that the appellant was on parole at the time the instant offenses were committed, enhancement factor (14) is applicable. Tenn. Code Ann. § 40-35-114(14)(B).

Finally, the trial court found the existence of enhancement factor (11), noting that the appellant had no hesitation about committing a crime when the risk to human life was high. This court has previously explained that "there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used." State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Thus, the high risk to human life is inherent in the offense of especially aggravated robbery. Id. Therefore, the trial court should not have applied this enhancement factor.

In sum, we conclude that enhancement factors (2), (3), and (14) are applicable to the appellant. The trial court found no mitigating factors. The appellant does not argue that any mitigating factors exist. Likewise, we can find no evidence in the record supporting the application of mitigating factors. Despite the error in the application of enhancement factors (9) and (11), we conclude that the trial court properly sentenced the appellant to the maximum sentence of forty years incarceration for the aggravated robbery conviction.

## 2. Consecutive Sentencing

Lastly, the appellant argues that the trial court should not have ordered that his sentence for especially aggravated robbery be served consecutively to his sentence for felony murder. We note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) (2003) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. See Tenn. Code Ann. § 40-35-115. In the instant case, the trial court found the existence of the following factors:

> (1) The [appellant] is a professional criminal who has knowingly devoted such [appellant's] life to criminal acts as a major source of livelihood;
>
> (2) The [appellant] is an offender whose record of criminal activity is extensive; and
>
> (4) The [appellant] is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Tenn. Code Ann. § 40-35-115(b)(1), (2), and (4) (2003).

On appeal, the appellant specifically does not dispute the trial court's findings that he is a professional criminal or that he has an extensive criminal history. Our review of the record reveals that the appellant confessed to engaging in thefts "everyday" in order to support his $200 to $300 per day drug habit, lending credence to the trial court's finding that the appellant is a professional criminal. See Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976) (defining a professional criminal as "one who has knowingly devoted [her]self to criminal acts as a major source of livelihood or who has substantial income or resources not shown to be derived from a source other than criminal activity"). Further, the record reflects that the appellant's criminal history consists of multiple felony and misdemeanor convictions, warranting the trial court's finding that the appellant's criminal history is extensive.

However, the appellant does dispute his classification as a dangerous offender. In order to

-26-

find that a defendant is a dangerous offender, a court must also find that (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) "the terms are reasonably related to the severity of the offenses." Wilkerson, 905 S.W.2d at 938; see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). In applying the dangerous offender factor, the trial court remarked, "I believe this man is a dangerous offender and the public needs to be protected from him and whose behavior indicates little or no regard for human life, no hesitation about committing the crime in which the risk to human life is high." Therefore, we conclude that the trial court made the necessary finding that consecutive sentencing was necessary to protect the public. However, the trial court failed to make the required finding that the sentences are reasonably related to the severity of the offenses. We conclude that the sentences are reasonably related to the severity of the offenses. Regardless, consecutive sentencing is permissible upon finding only one of the qualifying criteria. In the instant case, three criteria are applicable. The trial court did not err in imposing consecutive sentencing.

### III. Conclusion

In sum, we conclude that the appellant's attempted especially aggravated robbery conviction should be merged into his especially aggravated robbery conviction. The appellant's convictions of especially aggravated robbery and felony murder conviction are affirmed, and the appellant's total sentence is life plus forty years. We remand to the trial court for correction of the judgments as set forth in this opinion.

_____

NORMA McGEE OGLE, JUDGE