**STATE of Tennessee, Appellee,**

v.

**Jeffrey CAUSBY and Eugene Montgomery, Appellants.**

Supreme Court of Tennessee, at Knoxville.

March 3, 1986.

---

Richard W. Pectol and Penny J. White, Johnson City, for Jeffrey Causby.

Rondal B. Cole, Elizabethton, for Eugene Montgomery.

Wayne E. Uhl, Asst. Atty. Gen. (W.J. Michael Cody Atty. Gen. and Reporter, Nashville, of counsel), for appellee.

## OPINION

COOPER, Justice.

This case involves the appeals of two defendants convicted of first-degree mur-

der and sentenced to life imprisonment. The issues for review concern the admission of a witness' former testimony as substantive evidence, the sufficiency of the evidence, prosecutorial misconduct, and the possible illegal separation of the jury during sequestration. The Court of Criminal Appeals found no reversible error and affirmed the convictions. We hold that the defendants have established a prima facie case of illegal jury separation, and we remand this cause for an evidentiary hearing on that issue. In all other aspects the Court of Criminal Appeals is affirmed.

Ben Tester, an elderly resident of Hampton in Carter County, was murdered on the night of August 26, 1981. Witnesses testified that they saw the two defendants, and other participants in the crime, in the area of the Tester home on the days prior to the murder, and on the afternoon of the murder. Mr. Tester's daughter-in-law testified that Mr. Tester had returned from church at about 8:20 or 8:30 p.m. had visited with her and her family for about twenty minutes, and had then returned to his home, which was next door. Ms. Shelby Casey, a neighbor of Mr. Tester, testified that she saw a pickup truck and a car in the Tester driveway at about 8:45 p.m., and that the two vehicles were still in Mr. Tester's driveway at about 9:45 p.m. when she decided to drive to a nearby barber shop to purchase a soda. As she entered her car she saw approximately six people carrying something out of the house and then go out of sight between the two vehicles. As she returned home she saw four boys leaving Mr. Tester's yard and crossing the road in front of her. She recognized Eugene Montgomery. She reached her house, glanced at the Tester residence, and noticed that the lights were out and the vehicles were gone. Ms. Casey got out of her car, heard a noise, turned, and saw Jeffrey Causby running from Mr. Tester's yard. She saw Causby trip at the edge of her yard and yell "oh, hell" three times.

Mr. Tester's body was discovered the next day by a child returning from school. It was hanging by the neck from a nylon rope tied to a branch of an apple tree in the yard. Death was caused by asphyxiation. The police investigation revealed that a screen on a front window of the house had been cut and ripped open, and that the house had been ransacked.

The defendants were juveniles at the time of the murder. A transfer hearing was held and both were transferred to the Carter County Criminal Court to be tried as adults. The defendants and four others were indicted for first-degree murder on February 22, 1982. One participant, Clifford Peele, decided to cooperate with the police and testified at the transfer hearing that Eugene Montgomery, Jeffrey Causby, Joe Street, and himself had planned the burglary of the Tester home. They drove to a car wash to pick up some nylon rope that Street had stored there, and they proceeded to Mr. Tester's home in a white pickup truck. Peele testified that Montgomery and Causby cut the screen out of the window, entered the house, and then opened the front door. They began to search through the house, but Montgomery saw Mr. Tester approaching. Mr. Tester came in the front door, Peele and Street grabbed him, and he was knocked unconscious. Peele stated that Montgomery suggested that Mr. Tester be hung. He was then gagged and carried by all four to the bed of the pickup truck. Causby and Montgomery climbed the tree and attached the rope while Peele and Street placed the other end around Mr. Tester's neck. They then lifted him off of the truck.

At trial, Peele suddenly denied that he had participated in or had knowledge of the defendants' participation in the murder. He testified as to his activities leading up to the burglary and murder, but exercised his fifth amendment rights when asked about the murder, except to deny his involvement. Peele was declared a hostile witness, and the transcript of his transfer hearing testimony was introduced as substantive evidence.

Sheriff George Papantaniou testified at trial that Montgomery and Street were incarcerated in his jail for unrelated offenses

when they asked to speak with him on September 11, 1981. The two were brought to his office, and Montgomery stated that "I'm here to confess to a murder. Do you think I need a lawyer?" The sheriff further testified that Causby and his father came voluntarily to his office on September 18, 1981, after Street had confessed. The sheriff told Causby that Street had implicated him in the murder, and he asked Causby if he still wanted to claim that he had been with Street throughout the night of the murder. Causby then made a statement, which was reduced to writing, that he had been with Street from 7:00 p.m. on the night of the murder until 3:00 a.m. the next morning, and that he had never been in Ben Tester's house.

Roby Osborne, the sheriff of Unicoi County, testified that Montgomery, Causby, and Street were held in the Unicoi Jail for a time after the murder. He stated that he was making some plumbing repairs in a cell block near where Causby was speaking with visitors. He testified that he heard Causby say, in response to a query about his participation in the murder, that "No, when they started that I ran like hell."

Both defendants contend that the former testimony of Clifford Peele should not have been introduced as substantive evidence, but should have been admitted only for impeachment purposes. In particular, they contend that they were denied their rights of confrontation as guaranteed by the Sixth Amendment of the United States Constitution, ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."), and Article 1, Section 9 of the Constitution of Tennessee ("That in all criminal prosecutions, the accused hath the right ... to meet the witnesses face to face....").

■■■ The same standards and criteria apply to both of the constitutional provisions. *State v. Armes,* 607 S.W.2d 234, 236 (Tenn.1980). The confrontation clause of the Sixth Amendment restricts the range of admissible hearsay in two ways. First, the admission of the hearsay testimony must be necessary, i.e., the declarant must be unavailable. Second, once the declarant is shown to be unavailable, some indicia of reliability must be shown. *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980).[1] The indicia of reliability requirement is met by those hearsay exceptions resting upon such solid foundations that admission of virtually any evidence within them comports with the right of confrontation. *Id.* at 66, 100 S.Ct. at 2539. We find that the former testimony exception to the hearsay rule rests upon such a solid foundation. Federal Rule of Evidence 804(b)(1) states:

(b) Hearsay exceptions

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony

Testimony given as a witness at another hearing of the same or a different proceeding, ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

We adopt the federal rule as a statement of the current law in Tennessee, and conclude that Clifford Peele's former testimony was properly admitted as substantive evidence.

■■■ Peele was unavailable for purposes of the former testimony exception. Proper invocation of the privilege against self-incrimination will render a witness unavailable, *State v. Armes,* 607 S.W.2d 234,

---

1. In *State v. Henderson,* 554 S.W.2d 117 (Tenn. 1977) and *State v. Armes,* 607 S.W.2d 234 (Tenn. 1980) a third requirement for complying with the confrontation clause was applied—that the evidence not be crucial nor devastating. This factor seems to have originated in dicta in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). We decline to further apply that requirement in the case of such a well established hearsay exception as former testimony. Furthermore, the United States Supreme Court has not applied this requirement in later cases dealing with former testimony. *See Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), and *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

237 (Tenn.1980), and Peele properly exercised that privilege. While Peele took the stand and testified as to his activities prior to the murder, he denied participating in the murder or having knowledge of it. He invoked his right to remain silent when questioned by the state about the murder itself. Thus, Peele gave no incriminating testimony. "[W]here the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." *McCarthy v. Arndstein*, 262 U.S. 355, 359, 43 S.Ct. 562, 67 L.Ed. 1023 (1923). The defendants also had full opportunity and similar motive to develop Peele's testimony by cross-examination at the transfer hearing. Both defendants had counsel at the transfer hearing, and the same counsel represented the defendants at trial. Peele's testimony was given under oath in a trial-like atmosphere, and the transcript of the hearing reveals almost 100 pages of cross-examination. Whether or not the defendants had committed the alleged offense was central to both the transfer hearing and trial. *See* T.C.A. § 37–1–134(a)(4)(A). In both instances the defendants sought to prove their innocence. Thus, the requirements of the former testimony exception have been met.

Furthermore, while Peele was technically unavailable for the purpose of allowing the admission of his former testimony, he was present at trial and did testify concerning his making of the prior statements. "[T]he confrontation clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of events in question, thus opening himself to full cross-examination at trial as to both stories." *California v. Green*, 399 U.S. 149, 164, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970).

Having found that the former testimony of Clifford Peele was properly admitted as substantive evidence, we conclude that there was abundant evidence to support the convictions. Even absent Peele's former testimony, there was sufficient evidence from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Both defendants have alleged that reversible error occurred due to various improper statements made by the state during voir dire and closing argument. We have reviewed each of these alleged instances of misconduct in light of the standards established in *Judge v. State*, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976). We find no error which could have affected the judgment. T.R.A.P. 36(b).

The defendants also contend that they have properly established a prima facie case of illegal jury separation during sequestration. Defendants' attorneys stated at the hearing on the motions for new trial that they had become aware of an improper jury separation. No evidence on this issue was presented at the hearing, but the trial judge authorized the attorneys to contact the jurors and ask limited questions concerning outside influences. Counsel requested that they be allowed to file supplemental affidavits as to whatever occurred, and the trial court responded that any answers indicating impropriety should be recorded and that a hearing would be held. The trial judge later told the attorneys to file "[a]nything you want—if you can show that there was something went on that you don't know about ... anything, I'll be open. Okay?" Causby's counsel filed an envelope with the court ten days later containing the affidavit of an employee of the hotel where the jury had stayed. She stated in the affidavit that she saw the jurors picnicking with their families with only a few officers supervising them, and that some jurors had been in their rooms with family members without any supervision. She also stated that she saw a newspaper containing a headline about the trial in one of the juror's rooms. Shortly after this affidavit was filed, Montgomery's counsel

filed an envelope containing his own affidavit. It stated that a juror told him that the jury had access to newspapers discussing the trial, and that during the picnic the jurors were able to talk to their families without supervision.

The motions for new trial were overruled on April 4, 1983. The two envelopes containing the affidavits were not included in the record when it was filed with the Court of Criminal Appeals on September 19, 1983. The clerk of that court received two sealed envelopes containing the affidavits, and an order from the trial court, on September 30, 1983. The trial judge stated in the order that the two affidavits had been filed by the defendants, that the court had "been made aware of the contents of said affidavits before ruling on defendants' motion for new trial," that the documents were "critical to the issues on appeal," and that they should be made part of the record.

The Court of Criminal Appeals refused to consider these affidavits since they were not admitted into evidence by the trial court, the order did not indicate that the trial court acted upon the affidavits, and neither the affidavits nor the envelopes containing them were identified and authenticated and ordered to be made part of the transcript.

T.R.Cr.P. 33(c) states that "[a]ffidavits in support of a motion for a new trial may be filed with the motion or an amended motion. If filed, they shall be considered as evidence by the court." The rule gives the state ten days to file opposing affidavits.

■ T.R.A.P. 24(e) provides that the record may be corrected or modified to conform to the truth if "any matter properly includable is omitted from the record, is improperly included, or is misstated therein." Any dispute concerning the accuracy of the record is to be determined by the trial court, and its determination is conclusive absent extraordinary circumstances. "If necessary, the appellate court may direct that a supplemental record be certified and transmitted."

■ After applying these rules to the peculiar facts of this case, we conclude that the Court of Criminal Appeals erred in failing to consider these affidavits. We interpret the comments of the trial judge at the hearing to mean that he would reserve judgment on the motions for new trial until the defendants had opportunity to file supplementary affidavits in support of their motions. It was indicated that a hearing would be held if any juror misconduct was shown. The defendants could have reasonably believed that the affidavits would be considered as part of their motions for new trial. Once the affidavits were filed, then T.R.Cr.P. 33(c) mandated that they be considered as evidence by the trial court. Thus, these documents were "properly includable" in the record since they had to be considered as evidence.

■ The trial court's order does not make specific reference to T.R.A.P. 24(e), but it appears to be an attempt to comply with it. The order indicates that the trial judge thought the affidavits were properly includable in the record. The statement by the trial judge that he had "been made aware of the contents of said affidavits" is sufficient indication that the affidavits were considered, especially since T.R.Cr.P. 33(c) required that they be considered as evidence. While there may have been technical deficiencies in the manner in which the affidavits were added to the record, such as only the order being certified by the trial court clerk, the purpose for allowing correction or modification of the record is "to convey a fair, accurate and complete record of what transpired in the trial court." T.R.A.P. 24(g). That goal will be best achieved by considering these affidavits as part of the record. The trial judge correctly noted the critical nature of the affidavits, and we note that the appellate court itself could have ordered that a supplemental record be properly certified and transmitted. T.R.A.P. 24(e).

■ The state concedes that if the affidavits were properly preserved for appeal, then they do "present prima facie evidence of a jury 'separation,' raising the possibility

of prejudicial outside contact by one or more jurors." However, the state also contends that it was never given an opportunity to respond to the prima facie showing made by defendants in the affidavits. T.R. Cr.P. 33(c) clearly contemplates that the state be allowed to respond to such affidavits. Once a defendant has made out a prima facie case of jury separation, the state must then be given an opportunity to overcome the prima facie case by showing that no separation occurred, or that it was harmless. *Gonzales v. State*, 593 S.W.2d 288 (Tenn.1980). Since the state has been denied this opportunity, the case will be remanded to the trial court solely for an evidentiary hearing and decision by the trial court on the issue of jury separation. All other issues raised by the defendants are overruled. Costs of the appeal are adjudged against the defendants.

BROCK, C.J., FONES and HARBISON, JJ., and FRANKS, Special Justice, concur.