IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 7, 2006

**STATE OF TENNESSEE v. TAMAINE WORKS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02521     James C. Beasley, Jr., Judge**

_____

**No. W2005-01048-CCA-R3-CD  - Filed May 26, 2006**

_____

This is a direct appeal from a conviction on a jury verdict of first degree premeditated murder. <u>See</u> Tenn. Code Ann. § 39-13-202.  The Defendant was sentenced to life in prison.  On appeal, the Defendant raises five issues: (1) the trial court erred in allowing the State to define premeditation for prospective jurors through the uses of examples during voir dire; (2) the trial court erred in excluding from evidence the victim's alleged involvement in a prior homicide; (3) the trial court erred in allowing as evidence at trial the prior testimony from an unavailable witness; (4) the trial court erred by allowing the testimony of three of the State's rebuttal witnesses; and (5) the evidence was insufficient to find him guilty beyond a reasonable doubt of the crime of first degree, premeditated murder.[1]  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Tamaine Works.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; Paul Hagerman and Dean Decandia, Assistant District Attorney Generals, for the appellee, State of Tennessee.

---

[1]For the sake of clarity, we have re-ordered the issues from the manner in which they were presented by the Defendant in his appellate brief and have combined two arguments that dealt with the same issue.

**OPINION**

**FACTS**

The conviction in this case stems from the October 9, 2003 murder of Mr. Keon McChristian[2] (the "victim") in an apartment complex in Memphis. The Defendant, Tamaine Works, confronted the victim in a second floor hallway at the Peppertree Apartments about 10:30 at night and fired four shots from an assault-type weapon, hitting the victim twice. The victim died from his wounds. The Defendant fled the scene but was arrested by police at the same apartment complex several months later. In March of 2004, the Defendant was indicted by a Shelby County grand jury on one count of first degree, premeditated murder. The Defendant received a jury trial, which was conducted over the course of several days in February and March, 2005.

Before the jury was seated, the trial court took up several preliminary matters. The State presented a motion to exclude the Defendant from introducing testimony concerning the victim's alleged involvement in the death of a friend of the Defendant a few hours prior to the murder at issue in this case. The State argued that any evidence of this prior killing was not relevant. The Defendant presented a motion to exclude the prior testimony of a State witness who was unavailable to testify at trial, alleging that the statement, although made under oath at a preliminary hearing, was unreliable. The trial court granted the State's motion and excluded testimony concerning the prior homicide but denied the Defendant's motion and allowed the prior testimony of the unavailable witness.

At trial, the State's lead witness, Ms. Kimberly Pruitt, testified that on the night of the murder, she was staying with her cousin at the Peppertree Apartments. As she exited her cousin's apartment with her six-year-old son sometime after 10:00 in the evening on October 9, 2003, she passed the Defendant in the hallway on the second floor of the apartment complex building. She recognized the Defendant as someone she had seen around the complex for several years and who was a friend of "Brian," the man her cousin was dating at the time. As the Defendant passed her in the hallway, Ms. Pruitt's cousin, who was immediately behind her, asked: "Tamine, what you fixin' to do?"[3] Ms. Pruitt stated the Defendant replied, "Shhh," indicating the two women should remain quiet.

Ms. Pruitt stated that at the time, the Defendant was not wearing a shirt, had on black or dark-colored jeans, and was carrying a large gun only partially concealed in a garbage bag. She further stated that the Defendant was only three or four feet from her when they passed in the hallway, and she saw his face. The Defendant walked toward the apartment next door, the residence of a man known as "V." Ms. Pruitt walked the opposite direction toward the stairs, and her cousin went back inside her apartment and closed the door. Ms. Pruitt testified that she then saw the Defendant shoot the victim, which she described as follows: the victim came out of "V'"s apartment; the Defendant

_____

[2]The indictment recites the victim's last name as "McChristain."

[3]The record reveals that Ms. Pruitt's cousin could not be located at the time of the trial.

shot the victim two times; the victim fell to the floor; the Defendant shot the victim two more times; the Defendant then fled.

Ms. Pruitt testified that after the Defendant fled, she ran to the victim, who said: "He shot me." Ms. Pruitt stated that she called 911 from her cellular phone and reported the incident. She also stated that approximately five or ten minutes after the shooting, "V" came and asked her who shot the victim, but she declined to answer. She further stated that when "V" heard the police arrive, he took off. Ms. Pruitt also testified that the victim did not have a gun. When the police arrived, she was forced to place her hands in the air, but when they learned she was not a threat, she was allowed to leave and did not give a statement to the police the night of the murder.

Ms. Pruitt also testified that she began to receive threats over her cellular phone from the Defendant's friend, who would call and tell her that she did not "need to be testifying against his friend and that something's going to happen to [her] and [her] children if [she] do[es] come forward." Because of these threats, Ms. Pruitt did not make a statement to the police until several weeks later when she was in the hospital.

On cross-examination, Ms. Pruitt admitted she had a felony record. She stated that she did not tell "V" who shot the victim because she was "paranoid." She also stated that "V" did not take anything from the victim, but that "V" was carrying a hand gun. Ms. Pruitt also clarified that while she did not make a statement to the police the night of the murder, she did leave an anonymous tip on the 528-CASH tip-line the following day. However, she then began to receive threats over the phone and therefore did not talk to the police until several weeks later when she was in the hospital suffering from anxiety attacks and no longer wanted to "hold it in." The police came to her hospital room and she gave them a statement. She also admitted that during this meeting she was shown a photographic line-up but could not identify the Defendant's photo because she was on medication that caused blurred vision.[4] However, she did identify the Defendant's photo at trial. She also identified the Defendant in court as the man she witnessed shoot the victim.

Ms. Memorie Noel, the victim's aunt, also testified at trial, stating that she lived in the same apartment complex and heard four gunshots on the evening of the incident at approximately 10:30. Shortly thereafter, a neighbor came to her door and informed her that her relative had been shot. She rushed to the victim, who was lying on the ground, and noted that also at the scene was "a girl" and "V," whom she identified as Vincent Sulton, who also went by the moniker "Big V" and "V Dog."

Sergeant Gene Hulley, an Investigator with the Memphis Police Department Felony Response Squad, testified that he assisted the crime scene investigators on this case. Although the victim had been removed by the time he arrived, he stated that he observed at the crime scene bullet holes on the building walls, spent shell casings, and a blood stain on the floor. He described the shell casings as consistent with a "large caliber, automatic weapon."

---

[4]Sergeant Barry Hanks of the Memphis Police Department also testified at trial that he showed Ms. Pruitt the photographic line-up while she was in the hospital, but she stated she could not see well due to medication.

Officer Ellason Flagg of the Memphis Police Department testified that on January 24, 2004, she received a report that the Defendant was at the Peppertree Apartments. There was a warrant for the Defendant's arrest. Officer Flagg stated that when the Defendant saw the uniformed officers, he fled. The officers pursued, eventually captured the Defendant, and placed him under arrest.

An audio tape of Memphis Police Officer Sergeant Sims' testimony at the Defendant's March 4, 2004 preliminary hearing was played for the jury at trial and entered into evidence.[5] Sgt. Sims testified that he attempted to take a statement from the Defendant after his arrest, but the Defendant, after he was advised of his rights, elected to not make a formal statement. However, the Defendant did remark to Sgt. Sims that "wasn't nobody going to make it to testify against him in the courtroom." Sergeant Sims also stated that the Defendant refused to sign the advice of rights form.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, was certified as an expert in the field of forensic pathology, and testified that the victim suffered from a gunshot wound to the lower abdomen that did "extensive damage," and one gunshot wound to the leg. Dr. Chancellor opined that the gunshot wound to the abdomen was the cause of death because it severed two large blood vessels and caused massive bleeding.

Mr. Anton Armour, an acquaintance of the Defendant, was subpoenaed by the State and testified at trial, admittedly against his will, that at some point after the murder he was with the Defendant. They were talking about the past, and the Defendant made the following statement: "Man, you know I'm a real nigger, I'm a killer, you can ask them niggers in the Peppertree about me." On cross-examination, Mr. Armour admitted he was a convicted felon.

The Defendant, properly advised of his rights, elected not to testify on his own behalf. The defense did called Sergeant Timothy Cooper of the Memphis Police Department, who testified that when he arrived at the crime scene shortly after midnight, there was no one there who witnessed the crime and was willing to talk to him. Officer William Merritt of the Memphis Police Department testified that he interviewed the Defendant along with Sgt. Sims, and stated that the Defendant did sign the advice of rights form.[6] Officer Merritt also stated that the Defendant never made any incriminating or threatening statements while in his presence, but admitted on cross-examination that there were times when the Defendant was alone with Sgt. Sims.

The defense also called Mr. Vincent Sulton, a.k.a. "V." Mr. Sulton testified that in his initial statement to the police, made about four days after the crime, he stated that he had no personal knowledge of the events on the evening of the murder but knew the Defendant shot the victim because the Defendant had communicated threats, warning him not to talk. However, Mr. Sulton later made a second statement to police in which he recounted that he and the victim were away from

---

[5] The record reveals that Sergeant Sims of the Memphis Police Department was deceased at the time of trial.

[6] A copy of the advice of rights form, bearing the signatures of the Defendant, Sgt. Sims and Officer Merritt, was entered into evidence.

the apartments the day of the murder when the victim informed Mr. Sulton he was going to go to his apartment at Peppertree. Mr. Sulton informed police that the victim arrived first, he followed, and he was just coming up the stairs when he heard shots and saw the Defendant with a gun. The Defendant pointed the gun at him and then ran off. Mr. Sulton then informed the police that he was unarmed, went to the victim, took a handgun from the victim, threw it onto the roof, and ran when he heard the police.

On cross-examination, Mr. Sulton gave a third version of the events of the evening, testifying that he in fact did not come up the stairs, but rather was in his apartment when he heard the shots fired, and then came out. He maintained that he did not have a gun until he took one off of the victim, and he then chased after the Defendant. Mr. Sulton further stated that the Defendant called him "not even an hour afterwards" and threatened to kill him. Mr. Sulton also denied having ever told Ms. Turner, Mr. Nelms or Ms. Noel that the gun he had was his and that he retrieved it from off the television set in his apartment.

The State called three rebuttal witnesses: Ms. Roshunda Turner, the victim's aunt; Mr. Damen Nelms, the victim's uncle; and Ms. Memorie Noel, another aunt of the victim and a previous witness. All three testified that they saw Vince Sulton a day after the murder, and he told them that after the shooting he went into his apartment and got a gun which was located on his television set.

At the conclusion of the trial, the jury returned a verdict of guilty on the indicted charge of first degree, premeditated murder. The trial court sentenced the Defendant to life in the custody of the Department of Correction. The Defendant timely filed a motion for a new trial, which was denied, and this appeal followed.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in allowing the State to make conclusions of law during voir dire and made several errors in the admission and exclusion of evidence. Specifically, the Defendant claims the trial court erred by excluding evidence pertaining to a prior murder, erred in allowing into evidence the prior testimony of a deceased declarant, and erred in allowing into evidence the testimony of three rebuttal witnesses called by the State. Additionally, the Defendant argues that the evidence presented at trial was insufficient for any rational trier of fact to find beyond a reasonable doubt that he was guilty of first-degree, premeditated murder.

### I. Voir Dire

In his first issue on appeal, the Defendant asserts that the trial court erred by "allowing the State to give numerous examples to the potential jurors of what the State believed was the difference between premeditated murder and a killing of passion." The Defendant objected to two examples used by the State during voir dire; stopping to get gas on a drive home as an example of premeditation, and the classic "law school" hypothetical for a heat of passion killing: a man comes home, finds his wife in bed with another man and then kills him immediately, as opposed to waiting

three hours, following the miscreant home and then killing him. The Defendant argues that these hypotheticals "improperly tracked the evidence admitted at trial" because one possible defense was a heat of passion killing as revenge for the victim's alleged involvement in a murder of the Defendant's friend that occurred three hours prior to the murder at issue in this case. Thus, the Defendant argues, the State's examples "grossly encroached on the province of the jurors in determining the factual point in time when a crime of passion would become a premeditated murder."[7]

We begin our analysis of this issue by noting that the trial court is vested with great discretion in determining how voir dire examination will be conducted, and the trial court's decision on how this examination will be conducted will not be overturned absent a finding of abuse of discretion. See State v. Mickens, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003). In this case, the Defendant argues that the State improperly tried to coerce potential jurors into committing to a particular course of action through the use of hypothetical scenarios.

We find the examples or hypotheticals used by the State to be rather innocuous and conclude that the questioning conducted by the State during voir dire did not result in any commitment from prospective jurors beyond their "appropriate willingness to decide the [issues in the case] on all of the evidence adduced at trial, free of any preconceived notion[s]." State v. Coe, 655 S.W.2d 903, 911 (Tenn. 1983). Accordingly, we conclude that the trial court did not abuse its discretion in conducting the qualification process of jurors during voir dire in this case. See Solomon v. State, 489 S.W.2d 547, 550 (Tenn. Crim. App. 1972) (holding it was within the trial court's discretion to allow a voir dire to continue after the Defendant sought to get jurors to commit to a course of action through the use of a hypothetical question). Additionally, we note that the trial court instructed the jury to "take the law as I give it to you," and recited during both the opening and closing jury instructions the correct legal explanation pertaining to the element of premeditation. Accordingly, had there been an error during voir dire, it was cured by the court's thorough instructions and therefore rendered harmless. See Tenn. R. App. P. 36(b).

## II. Evidentiary Rulings

The Defendant asserts in his next three issues that the trial court erred in its determination of admissible evidence. Specifically, the Defendant argues that the trial court erred in excluding evidence of a prior murder, in including the prior testimony of an unavailable declarant, and in allowing the testimony of three State rebuttal witnesses.

### A. Exclusion of evidence pertaining to a prior murder

The Defendant claims that the trial court erred in excluding from evidence any testimony that the victim in this case was involved in the murder of the Defendant's friend only "hours earlier." The trial court granted the State's motion to exclude this evidence after concluding that testimony concerning this separate homicide was not relevant to the issues in the Defendant's case. The

---

[7]We note that the record is devoid of evidence that a "heat of passion" defense was ever pursued by the Defendant at trial.

Defendant now argues this evidence is relevant as it explained his "state of mind." The Defendant also argues that it was error for the trial court to prohibit him from arguing two separate defense theories.

The record reflects that prior to trial, the court conducted an evidentiary hearing on several preliminary motions including the State's motion to exclude testimony of a prior murder. The State argued that it was not aware of any proof that the Defendant knew of this prior murder, so it was therefore irrelevant. The Defendant expressed his desire to have the option of presenting the defense that he did not commit premeditated murder but rather a heat of passion killing as revenge for this prior murder; thus, the evidence was relevant. The trial court stated: "If your defense is, I didn't do it, then I don't see how the first case is relevant," but added that if the Defendant was going to argue an "alternative mental state," then evidence of the prior murder would be relevant. However, defense counsel declared that he would proceed based on the defense that the Defendant "didn't do it and [the State] ha[s] to prove otherwise." Accordingly, the trial court found that the evidence of the prior murder would merely "smear[] the credibility" or character of the victim and was not relevant.

Generally, evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rules of Evidence provide that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In this case, any testimony that may have been proffered with regard to an alleged prior murder was not relevant based on the defense theory presented to the jury. The record reflects that the Defendant made tactical decisions pertaining to his defense in which he elected not to testify himself and to pursue a primary defense theory of "I didn't do it." As such, the Defendant never proffered any evidence that he was aware of the prior murder. More significantly, even if the Defendant did know of this earlier act and wished to avenge the murder of his friend, his defense, which was completely devoid of arguments pertaining to a lesser mental state than that required for a conviction of premeditated murder, rendered any evidence of a prior murder irrelevant in his case. Accordingly, the trial court did not err in granting the State's motion to exclude this evidence. This issue is without merit.

### B. Prior testimony of an unavailable declarant

The Defendant next claims that the trial court erred in allowing the State to introduce the preliminary hearing testimony of Sergeant Sims of the Memphis Police Department. To support this claim the Defendant argues that the testimony was unreliable and therefore should not have been allowed at trial pursuant to the prior testimony hearsay exception. The Defendant also argues that

the statement Sgt. Sims testified the Defendant made was either not relevant to his first degree murder case or any probative value it had was outweighed by the substantial prejudicial effect it had on the Defendant.

1.  Prior testimony hearsay exception

It is undisputed that Sgt. Sims' testimony from the preliminary hearing was given under oath and the Defendant had opportunity to cross-examine him at that time.  Additionally, the record reveals that Sgt. Sims was deceased at the time of trial and therefore obviously unavailable to testify in person.  Nevertheless, the Defendant argues that Sgt. Sims' testimony was "absolutely and verifiably false," and therefore unreliable.  The basis of the Defendant's argument centers around a contradiction in Sgt. Sims' testimony and other evidence presented at trial.  Sergeant Sims testified at the preliminary hearing that the Defendant did not sign the advice of rights form, but a copy of this form bearing the Defendant's signature was introduced at trial.  Following an evidentiary hearing on the matter, the trial court noted that the misstatements in Sgt. Sims' testimony "would go to the weight that a jury wants to give that statement," but was nevertheless admissible under the long recognized hearsay exception.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802.  Clearly, Officer Sims' preliminary hearing testimony was hearsay. See Tenn. R. Evid. 801(c).   However, in limited circumstances, prior testimony may be admissible at trial via a hearsay exception if the declarant is unavailable and if the party against whom the testimony is offered had an opportunity and a similar motive to develop the testimony through other methods such as cross-examination. See Tenn. R. Evid. 804(b)(1).

In addition to the general rule excluding hearsay, criminal defendants are also guaranteed the right to confront witnesses against them. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."); Tenn. Const. art. I, § 9 ("That in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face . . . .").  Accordingly, in cases such as this where the prosecution offered the former testimony of an unavailable witness, the State must also establish two prerequisites in order to satisfy a defendant's constitutional right of confrontation.  First, the State must show that the declarant is truly unavailable after good faith efforts to obtain his presence, and second, that the evidence carries its own indicia of reliability.[8] State v. Summers, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004). See also State v. Arnold, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986). With respect to the latter requirement, the United States Supreme Court has recently mandated that the reliability of a prior testimonial statement is established exclusively through cross-examination. See Crawford v. Washington, 541 U.S. 36, 54 (2004).

---

[8]This Court previously noted that "[a]t one time, there was a third requirement, that the evidence not be crucial or devastating." Summers, 159 S.W.3d at 597 n.4.  However, our most recent case law has "disposed" of this third requirement. Id.

In this case, it is undisputed that the declarant was deceased at the time of the Defendant's suppression hearing and trial and therefore was unavailable to testify in person. As to the second requirement, our supreme court has previously ruled that the former testimony exception to the hearsay rule is based on such a firm foundation that it meets the indicia of reliability requirement. See State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986). Additionally, the audio recording of Sgt. Sims' testimony entered into evidence clearly captured the Defendant's then counsel cross-examining the officer. This cross-examination was thorough and did indeed reveal weaknesses in the officer's statements, such as the fact that the Defendant's statement was not recorded via any type of electronic media and that Sgt. Sims failed to note the incriminating statement in his written report even though it was the type of statement that would normally be documented. Under these circumstances, we are unwilling to find that the cross-examination requirement was not met. Moreover, any mistakes or misstatements contained in Sgt. Sim's testimony goes to the weight of his testimony, not its admissibility, and is therefore properly a matter for the jury to consider. See Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974). As such, we find the testimony met the indicia of reliability requirement necessary to comply with the Defendant's right to confront witnesses and be admitted under the prior testimony hearsay exception.

2. Defendant's statement was irrelevant or excessively prejudicial

The Defendant also argues that the statement attributed to him by Sgt. Sims was not relevant to his trial, or if it was, any probative value it had was outweighed by substantial prejudicial effect. Sergeant Sims testified that the Defendant made the remark that there "wasn't nobody going to make it to testify against him in the courtroom." The State argues on appeal that this not so veiled threat was relevant as it reflected his consciousness of guilt. We note that the trial court overruled the Defendant's motion to suppress on this issue, finding that the statement was relevant as to the "mental state" or "guilty knowledge" of the Defendant.

This Court has previously declared that "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978). The Tennessee Supreme Court has endorsed this Court's holding that "[g]enerally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." State v. Austin, 87 S.W.3d 447, 477 app. (Tenn. 2002) citing Neil P. Cohen et al., Tennessee Law of Evidence § 4.01 (4th ed. 2000)). Accordingly, we conclude that the statement made by the Defendant to Sgt. Sims was relevant, and further find that no danger of unfair prejudice substantially outweighed its admission. Therefore, we conclude the trial court did not err in denying the Defendant's motion to exclude the testimony of Sgt. Sims. This issue is without merit.

**C. Admission of testimony from three rebuttal witnesses**

In the Defendant's final evidentiary issue he claims that the trial court erred in allowing the State to introduce the statements of three rebuttal witnesses, whose testimony about a prior inconsistent statement made by defense witness Vince Sulton, a.k.a. "V," refuted portions of the

testimony Mr. Sulton gave at trial. To support this claim the Defendant argues that the court erred by accepting the rebuttal testimony as "substantive evidence," and that the admission of the rebuttal witness testimony made the previously excluded evidence concerning the prior murder relevant and therefore admissible.

Mr. Sulton testified at trial that he took a hand gun off of the victim, and he specifically denied that he obtained the gun from off of the television set in his own apartment or told anyone else that he had. The Sate called three rebuttal witnesses, Ms. Turner, Mr. Nelms and Ms. Noel, who all testified that Mr. Sulton previously informed them that he obtained the gun he had the evening of the murder from off the television set in his apartment. The State argues on appeal that the trial court was correct in its determination that the rebuttal witness testimony be presented to the jury as evidence of a prior inconsistent statement made by defense witness Mr. Sulton. This evidence, the State argues, is relevant to the credibility of Mr. Sulton's testimony. The Defendant argues that the trial court entered the rebuttal testimony as "substantive evidence" that the victim did not have a gun, and this "opened the door to evidence of the first homicide."[9]

Tennessee Rules of Evidence state that the "credibility of a witness may be attacked by any party . . . ." Tenn. R. Evid. 607. Thus, a prior inconsistent statement may be used to impeach the credibility of a witness who denies having made the prior statement. See State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). Additionally, Tennessee Rule of Evidence 613 governs the use of extrinsic evidence of a prior inconsistent statement of a witness, and mandates that such extrinsic evidence is inadmissible until (1) the witness is asked whether he or she made the prior inconsistent statement; and (2) the witness denies having made the prior inconsistent statement. See also State v. Martin, 964 S.W.2d 564, 566-67 (Tenn. 1998).

In this case, the record clearly demonstrates that Mr. Sulton was asked whether he made a prior inconsistent statement to his testimony at trial, i.e., that he previously told several people he obtained the gun from his apartment and not from the victim as he stated for the jury. Mr. Sulton denied having made this inconsistent statement. Accordingly, the trial court did not err by allowing the State to introduce extrinsic evidence of this prior inconsistent statement in the form of rebuttal witness testimony for the purpose of attacking the credibility of Mr. Sulton.

The Defendant is correct in his assertion that restrictions on hearsay limit the admissibility of prior inconsistent statements. The Tennessee Supreme Court has clarified that "prior inconsistent statements 'are not to be considered as substantive evidence of the truth of the matter asserted therein'" but rather such evidence is "'limited to the function of discrediting the witness.'" State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) (quoting Jones v. Lenoir City Car Works, 392 S.W.2d 671, 673 (Tenn. 1965) and Rhea v. State, 347 S.W.2d 486, 488 (Tenn. 1961)). However, contrary to the

---

[9]It appears that the Defendant is operating under the following theory: the victim had a gun; this gun was used by the victim to murder the Defendant's friend; this prior murder occurred only several hours before the murder at issue in this case; therefore, allowing the rebuttal witness testimony about the gun "opened the door" to admission of evidence concerning this prior murder.

Defendant's claims, there is no evidence in the record before this court that the rebuttal witness testimony was admitted for any purpose other than to impeach the credibility of Mr. Sulton. Moreover, if the Defendant was concerned that the jury may improperly consider the rebuttal witness testimony as evidence of the facts stated, he had the duty to make a "timely objection," id., and to make a request that the trial court instruct the jury that the evidence may only be considered as reflecting upon the credibility of the witness. See Tenn. R. Evid 105 ("[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly.") (emphasis added).[10] Accordingly, we conclude that the rebuttal witness testimony was properly admitted in this case for the limited purpose of attacking the credibility of Mr. Sulton.

Because we find the evidence of Mr. Sulton's prior inconsistent statement was admitted for the sole purpose of attacking his credibility and not as substantive evidence of the facts recited, the Defendant's argument that this rebuttal witness testimony "opened the door" to evidence of the prior murder must fail.[11]   Based on the record before this Court, we conclude that the trial court did not err in admitting the rebuttal witness testimony. This issue is without merit.

### III. Sufficiency of the Evidence

In the Defendant's final issue on appeal, he claims that "[w]hen the evidence is considered in its totality, no reasonable jury could have concluded that the State had proved beyond a reasonable doubt that [the Defendant] committed first degree murder." In support of this assertion, the Defendant argues that the State failed to present any physical evidence and that the eye witness testimony submitted at trial was conflicting and generally unreliable. We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of

---

[10] The record reveals that the Defendant, through counsel, did object to the admission of the rebuttal witness testimony at trial, but did so based on relevance and concern over the admission of additional hearsay evidence. In a jury-out side bar, the trial court agreed to have the State limit its questioning to only the prior inconsistent statement and instruct the witnesses to not volunteer additional testimony while on the stand. Thus, the Defendant did request and was granted a restriction on the evidence submitted, but he did not request jury instruction on the matter. See Tennessee Rule of Evidence 105.

[11] More to the point, the admission of evidence pertaining to the prior murder is a separate issue which was fully addressed in a preceding section of this opinion.

the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree premeditated murder is defined in our criminal code as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is further defined as

> an act done after the exercise of reflection and judgment. [It] means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The Defendant in this case does not challenge on appeal that a murder was committed or that it was premeditated. Rather, the Defendant argues that the State failed to provide sufficient proof of his identity as the perpetrator. Specifically, the Defendant argues that the State failed to present any direct physical evidence: no gun was produced; no fingerprints were found; no other physical evidence linking the Defendant to the crime was introduced. The Defendant also challenges the reliability of several witnesses' testimony, noting that Mr. Armour and Ms. Pruitt were both convicted felons, Mr. Armour did not witness the murder, and Ms. Pruitt's testimony was riddled with "discrepancies" and portions were "absolutely absurd."

In this case, we conclude that the evidence was sufficient to establish that the Defendant killed the victim intentionally and with premeditation. Ms. Pruitt testified that she observed the Defendant the night of the murder at the Peppertree Apartments carrying a large gun, and saw the Defendant shoot the victim, firing four shots. Ms. Noel confirmed that four shots were fired the night of the murder, and Officer Hulley testified that the shell casings recovered at the crime scene were consistent with a "large caliber, automatic weapon." Dr. Chancellor testified that the victim died from the gunshot wound to his abdomen. Ms. Pruitt further testified that she was the first to approach the victim, followed by "V" and the victim's aunt. Ms. Noel confirmed that she was the victim's aunt, and when she arrived at the scene "V" was there along with "a girl." Mr. Armour testified that he had a conversation with the Defendant at some point after the murder during which

the Defendant bragged that he was a "killer," and if confirmation was needed Mr. Armour need only "ask [the residents] in the Peppertree about me." Officer Flagg testified that several months after the murder, when she and other uniformed officers approached the Defendant, the Defendant ran. Officer Sims testified that the Defendant made the remark that no witness would testify at trial against him.

A jury may infer guilt from the flight of a suspect if the facts of the situation support such an inference. See State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985) ("A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt."). Likewise, as noted above, "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness" is evidence from which a jury may infer guilt. Tillery, 565 S.W.2d at 511.

Additionally, the Defendant's emphasis on the lack of physical evidence in his case is misplaced, as such evidence is not required to uphold a jury verdict. This Court has previously held that convictions based upon witness testimony alone are sufficient. See, e.g., State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). The Defendant also asks this Court to discount the testimony of the State's witnesses because of "discrepancies" or because the declarants were themselves convicted felons. However, as noted above, this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236. Furthermore, questions about the credibility of witnesses, the weight and value of the evidence, as well as factual issues raised by the evidence are to be resolved by the trier of fact. Id.

After considering the evidence in the light most favorable to the State, we determine that the Defendant has failed to demonstrate that the jury was presented with insufficient evidence at trial to find him responsible for the murder at issue in this case. Accordingly, we conclude that the evidence submitted at trial was legally sufficient for a rational trier of fact to find the Defendant guilty of first degree, premeditated murder beyond a reasonable doubt. This issue is without merit.

## CONCLUSION
Based on the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

DAVID H. WELLES, JUDGE

-13-